SARAH E. BETSINGER, Respondent, *v.* B. FRANKLIN CHAPMAN et al., Administrators, etc., Appellants.

The words "next of kin" in the provision of the Revised Statutes (2 R. S. 114, § 9) authorizing "the next of kin, *entitled to share in the distribution of the estate*" of a deceased person, in the case specified, to commence an action against the executor or administrator, includes the widow of the testator or intestate.

Proof of matrimonial cohabitation, declaration of the parties and reputation that they are man and wife, is sufficient to found a presumption of marriage, and a prior marriage may thus be presumed, although there was a subsequent actual marriage between the parties.

(Argued March 8, 1882 ; decided April 11, 1882.)

APPEAL from order of the General Term of the Supreme Court, in the third judicial department, made January 25, 1881, which affirmed an order of Special Term denying a motion for a new trial herein, after verdict for plaintiff. (Reported below, 24 Hun, 15.)

The nature of the action and the material facts are stated in the opinion.

*C. B. Sedgwick* for appellants. The term "next of kin" does not legally include the widow. It means relatives in blood only. (Bouvier's Law Dictionary, "Next of Kin;" Redfield on Wills, 77, § 13; 2 Kent's Comm. 136; *Murdock* v. *Ward*, 67 N. Y. 387; *Fettiplace* v. *Gorges*, 1 Vesey, Jr., 46; *Garrick* v. *Camden*, 14 id. 372; 3 id. 244; 4 Beaver, 358; *Luci* v. *Dunham*, 69 N. Y. 36; *Hamlin* v. *Osgood*, 5 N. Y. Surr. [1 Redf.] 409–417; *Slosson* v. *Lynch*, 43 Barb. 147; *Keteltas* v. *Keteltas*, 72 N. Y. 312; chap. XV, title III, art. IV, § 1870 of the Code of Civil Procedure, part II, passed May, 1880; §§ 1905–2514; *Slosson* v. *Lynch*, 28 How. Pr. 417; *Dewey* v. *Goodenough*, 56 Barb. 57.) Statutes and contracts should be read and understood according to the natural and most obvious import of the language, without resort to subtle and forced construction, for the purpose of either limiting or extending their operation. Courts cannot correct supposed errors, omissions or defects in legislation or vary by construction the contracts of parties. The office of interpretation is to bring sense out of the words used and not to bring a sense into them. (Liebier's Polit. and Le Hermeneutics, 87; 2 Ruth's Inst., chap. 7, § 2; Story's Com. on Const., § 392; *Purdy* v. *The People*, 4 Hill, 384; Smith's Statutes, etc., § 478; *Waller* v. *Harris*, 20 Wend. 561; *McClusky* v. *Cromwell*, 11 N. Y. 601–602; *Johnson* v. *H. R. R. R. Co.*, 49 id. 455, 462; *Benton* v. *McKwire*, 54 id. 226; *Rosenplaenter* v. *Roessli et al.*, id. 262; *Hyatt* v. *Taylor*, 42 id. 258, 260; *Wood* v. *Berry*, 18 Ohio St. 455, 456, 462; Smith's Comm. on Statutory Construction, § 714; Sedgwick on Construction of Statutory and Constitutional Law [2d ed.], 195–209; *Pearce* v. *Atwood*, 13 Mass. 342 and 343; *Adams* v. *Tussentine*,

8 Ired. [N. C.] L. 147; *Merchants' Bk.* v. *Cook,* 4 Pick. [Mass.] 405, 411; *U. S.* v. *Magill,* 1 Wash. 463, 465; *Douglass* v. *Chosen Freeholders, etc.,* 38 N. J. L. 214; *Dickens* v. *The N. Y. C. R. R. Co.,* 23 N. Y. 158; *Green* v. *H. R. R. R. Co.,* 2 Abb. Ct. App. Dec. 277.) Cohabitation is to live together as husband and wife, to live together at bed and board. (*Yardley's Estate,* 75 Penn. St. 211, 213.) Without concomitant facts to prove marriage an irregular cohabitation and partial reputation avail nothing in proof thereof. (*Rose* v. *Clark,* 8 Paige, 574, 582; *Cunningham* v. *Cunningham,* 2 Dow's Parl. Rep. 482; *Clayton* v. *Wardell,* 4 N. Y. 230; *Foster* v. *Hawley,* 8 Hun [15 N. Y. Sup. Ct.], 68; *Fenton* v. *Reed,* 4 Johns. 52; *Jenkins* v. *Bisbee,* 1 Edw. Ch. 377; *Hicks* v *Cochran,* 4 id. 107; *In the Matter of Taylor,* 9 Paige, 611; *Jackson ex dem. Van Buskirk* v. *Clune,* 18 Johns. 346; *Cheney* v. *Arnold,* 15 N. Y. 345; *Caujolle* v. *Ferrie,* 23 id. 90; *O'Gara* v. *Eisenlohr,* 38 id. 296; *Christy* v. *Clark,* 45 Barb. 529.) Ante-nuptial contracts, whereby the future wife releases her claim to her right of dower and all other rights to the estate of her husband, are fully recognized in the law, and when fairly made and executed without fraud or imposition they will be enforced by the courts. (Bishop on the Law of Married Women, Book II, chap. 20, §§ 420 to 428; *Andrews* v. *Andrews,* 8 Conn. 79–85; *Pierce* v. *Pierce,* 71 N. Y. 154–157; Laws of 1849, chap. 375, § 3; *Curry* v. *Curry,* 10 Hun, 366; Story on Equity Jurisprudence, § 1370; *Dygart* v. *Remerscheneider,* 39 Barb. 417.) It is nowhere held in this State that a consideration for such a contract must be adequate. (*Andrews* v. *Andrews,* 8 Conn. 79.) The questions calling for an interview between the Rev. Mr. Remington and a man unknown to the witness were inadmissible on the ground that this man was not identified. (Wharton on Ev., § 20; Greenleaf's Ev., § 52; 1 id. chap. 52, are cases in note; *Townsend Manuf. Co.* v. *Foster,* 51 Barb. 346, 352; *S. C.,* 41 N. Y. 620; *Green* v. *Disbrow,* 56 id. 334, 336; Phillips' Ev. [4th Am. ed.]; Cowen and Hill's notes, p. 732, and note 195.)

*Mr. Shoecraft* for respondent.    Marriage may be proven to have taken place between the parties by proof of the declarations and admissions of the parties themselves, under circumstances which would naturally lead those to whom they were made to believe the parties were married.    The reception of the parties by their relatives and friends as husband and wife, and the wife being called and known by the name of her husband. .  Reputation in the community, growing out of the acts of the parties, which would lead people. to believe they were married.    Cohabitation where not commenced by known illicit intercourse. (*Jenkins* v. *Bisbee*, 1 Edw. Ch. 377; Mathews on Evidence, 283; 2 Greenleaf's Ev. 463; *Fenton* v. *Reed*, 4 Johns. 52, 54; *Rose* v. *Black*, 8 Paige, 576; *Jackson* v. *Clow*, 18 Johns. 346; 2 Kent's Comm. 53; *Storr* v. *Peck*, 1 Hill, 271; *Caujolle* v. *Ferrie*, 23 N. Y. 90; Bishop on Marriage and Divorce, §§ 13, 434, 457; *Starr* v. *Peck*, 1 Hill, 270; id. 272; *Caujolle* v. *Ferrie*, 23 N. Y. 90, 104; *Hicks* v. *Cochran*, 4 Edw. Ch. 107; *Taylor's Case*, Paige, 9; *Jackson* v. *Clow*, 18 Johns. 346; *Starr* v. *Peck*, 1 Hill, 270; *Caujolle* v. *Ferrie*, 23 N. Y. 90; *Fenton* v. *Reed*, 4 Johns. 52; *Starr* v. *Peck*, 1 Hill, 270; 23 N. Y. 90; *Pees* v. *Pees*, 2 H. of L. Cases, 351; 8 Paige, 574; *Clayton* v. *Wardell*, 4 N. Y. 230; 8 Hun [15 N. Y. Sup. Ct.] 68; *O'Garà* v. *Eisenlohr*, 38 N. Y. 296.)    In an ante-nuptial agreement the inadequacy of consideration or the utter disproportion of the sum named therein, as consideration therefor to the amount of the husband's property, is of itself evidence of fraud and renders it void. (*Matter of Klein's Estate*, 64 Penn. St. 122; 1 Bishop on Married Women, § 425; *Pierce* v. *Pierce*, 71 N. Y. 154; *Nesbit* v. *Lockman*, 34 id. 167; *Polhamus* v. *Moser*, 7 Rob. 489; *Bassett* v. *Third Ave. R. R. Co.*, 45 N. Y. 628; *Morss* v. *Sherril*, 63 Barb. 21, 26.) It is a question of intent not only in the construction of wills and trust deeds, but also in the construction of statutes whether the husband or wife shall be included in the term "next of kin." (*Merchants' Ins. Co.* v. *Hinman*, 15 How. Pr. 182; 34 Barb. 410; *Knickerbocker* v. *Seymour*, 46 id. 198; *Dewey*

v. *Goodenough*, 56 id. 54; *Murdock* v. *Ward*, 67 N. Y. 387; *Luce* v. *Dunham*, 69 id. 36; Potter's Dwarris on Statutes, 173; *Smith* v. *People*, 47 N. Y. 336; *Scofield* v. *Collins*, 3 Cow. 89; 15 Johns. 380.) The legislature intended to include the widow in the term "next of kin," in sections 9 and 10 of chapter 6, title 5, part 2 of the Revised Statutes. (Laws of New York, 1801; Revised Laws, 1813; Revised Laws of 1813, 313, chap. 75, §§ 3, 16; *Whitaker* v. *Whitaker*, 6 Johns. 117; *Schuyler* v. *Hoyle*, 5 Johns. Ch. 206; *Dominick* v. *Michael*, 4 Sandf. 374, 409; *Taylor* v. *Delancy*, 2 Caine's Cases in Error, 151; *Goodill* v. *Jackson*, 26 Johns. 722; 3 R. S., §§ 63, 99 [Banks' 6th ed.]; id., § 9, p. 123.) The legislature intended to include the widow as one of the next of kin, as the term is used in certain sections of the statutes, in closing up the estates of testators and intestates. (Dayton on Surrogates, 451, 452 [2d ed.]; *Murdock* v. *Ward*, 67 N. Y. 387; *Merchants' Ins. Co.* v. *Hinman*, 15 How. Pr. 182, 184, 185; 34 Barb. 410; id. 410–18.)

Andrews, Ch. J. The plaintiff claiming to be the widow of Peter Betsinger, deceased, brought this action to recover her distributive share of his estate, under sections 9 and 10, title 5, chapter 6, part 2, of the Revised Statutes. Section 9 provides that "if after the expiration of one year from the granting of letters testamentary or of administration, there be more than sufficient assets in the hands of any executor or administrator to discharge the debts of the testator or intestate; and if after reasonable demand made, and the offer of a bond with sufficient sureties, as in the next section prescribed by any legatee, or by any of the next of kin entitled to share in the distribution of the estate, such executor or administrator shall refuse to pay the legacy bequeathed by any will to such legatee, or the share of any such person entitled to distribution, he shall be liable to such action as the case may require at the suit of such legatee or next of kin, or their personal representatives." Section 10 requires that previous to the commencement of any such action, a bond to the executor or administrator shall be given with sureties, conditioned that if any debts owing by the testator or

intestate shall afterward be recovered, etc., for the payment of which there shall be no assets, other than the said share or legacy, then such legatee or next of kin shall " refund the legacy or share that may be recovered in such action, or such ratable part or proportion thereof, with the other legatees or representatives of the deceased, as may be necessary for the payment of said debts," etc. Peter Betsinger died intestate November 6, 1876, leaving personal property of the value of about $43,000, and the defendants were duly appointed administrators of his estate. The complaint alleged that the plaintiff and the defendants' intestate were married May 24, 1863. The answer denied the alleged marriage at that date, and averred that the parties were married January 20, 1864, and not before. It was conceded that there was a formal solemnization of a marriage between the plaintiff and Peter Betsinger, at the latter date, and an instrument, under seal, dated January 19, 1864, purporting to be an ante-nuptial agreement, between Peter Betsinger and Sarah E. Whaley (the maiden name of the plaintiff), was duly proved. The instrument recites that a marriage is about to be solemnized between the parties, and the party of the first part (Peter Betsinger) covenants, in case the proposed marriage shall be solemnized to give to the party of the second part, (Sarah E. Whaley), to be paid to her after his death, $200 in lieu of dower, and of all claims and demands on her part against his estate, and to relinquish all right or interest which he might acquire by such marriage to any property which his proposed wife might have or acquire, and he especially covenants that she shall retain and have the absolute control of her wearing apparel. The party of the second part, covenants to accept the sum of $200 out of the estate of the party of the first part, after his death in full of all claims on his estate, and in lieu of dower in his property, and of any articles that might be set apart to her, as widow, by appraisers, under the statute. The instrument was signed by the parties, the plaintiff signing it in her maiden name, and it is conceded that it was executed on the day of its date.

The question of fact litigated on the trial, was whether there

had been a marriage between the parties in 1863, prior to the marriage of January 20, 1864. The court charged that if the marriage in January, 1864, was the first and only marriage contracted between the parties, the plaintiff could not maintain the action; but that if there had been a valid marriage before the agreement of January 19, 1864, was executed, she was entitled to recover. The defendants, at the close of the evidence, moved that the plaintiff be nonsuited on two grounds: *first*, that she could not maintain the action under the statute, for the reason that she is neither legatee nor next of kin of the decedent; and *second*, that the proof was not sufficient to authorize the submission to the jury of the question of the prior marriage. The motion was denied, and the exception to the ruling of the court on this motion, presents the two material questions in the case.

The validity of the first ground upon which the nonsuit was asked, depends upon the construction to be given to the words "next of kin," in the tenth section of the Revised Statutes, above quoted. Unless the widow of an intestate is one of his next of kin within that section, this action, founded thereon, cannot be maintained. That the words "next of kin," in a strict or primary sense, do not include the widow, is well settled. This was adjudicated in *Murdock* v. *Ward* (67 N. Y. 387), in an action for the construction of a will, making a contingent gift, on the death of the sons of the testator, to their "next of kin, according to the laws of the State of New York," and it was held that the widow of one of the sons was not entitled to share in the distribution, Church, Ch. J., saying: "The words 'next of kin' do not legally include the widow. They mean relatives in blood." This decision was followed in *Luce* v. *Dunham* (69 N. Y. 36), and in *Keteltas* v. *Keteltas* (72 id. 312), which were also cases arising under wills. These cases construed the words "next of kin" according to their strict legal definition, there being nothing in the context showing that the testator intended to use them in a larger sense so as to include the widow. But in the construction of wills, statutes, or other written instruments, the intention is the controlling consideration, and words of descrip-

tion will be held to include subjects to which they are not strictly applicable, if it appears from the context, or other circumstances which may be legitimately referred to, that such inclusion was intended, and this was conceded in the cases cited. The purpose of the section of the statute we are now considering, was to give a remedy by action against executors or administrators, upon the conditions stated, for the recovery of legacies or distributive shares. The action may be brought "by any legatee or by any of the next of kin" (of the decedent) "entitled to share in the distribution of the estate." The widow of an intestate is a distributee under the statute of distributions. In all cases she is entitled to a part, and in one contingency, to the whole of the personal estate of the intestate. (2 R. S. 96, § 75.)

There does not appear to be any reason, why she should not have the same remedy to recover her distributive share, as other distributees of an intestate's estate. We think, the words "next of kin," in section 10, were intended to include the widow of the intestate. The section is a revision of sections 18 and 19, of chapter 75, of the Revised Laws of 1813. Section 19, gave an action to any legatee, or to any person "entitled to any share, on the distribution of the estate of any intestate." This plainly included the widow. The revisers, in the revision of 1830, condensed sections 18 and 19, of the Revised Laws, and altered the phraseology, and defined in different language, the persons entitled to sue. The words "legatee, or any of the next of kin entitled to share in the distribution of the estate," were inserted in place of the words above quoted. But the note of the revisers to the new section, indicates, that there was no intention to change the meaning of the former section. Prior to the Revised Statutes, the husband in popular, though inaccurate speech, was said to be next of kin to his wife, and conversely the wife, the next of kin to the husband. In *Schuyler* v. *Hoyle* (5 Johns. Ch. 206), Chancellor KENT says, that the wife's choses in action vest in the husband, by the statute of distribution, "as her next of kin." Similar language is used by SPENCER, J., in *Whitaker* v. *Whitaker* (6 Johns. 112).

The general rule is, that in the construction of a revised act, " a mere change of phraseology, shall not be deemed or construed a change of the law, unless such phraseology evidently purports an intention in the legislature, to work a change. " (*Taylor* v. *Delancy*, 2 Caines' Cases in Error, 143 ; *Goodell* v. *Jackson*, 20 Johns. 693.) In view of the circumstances stated, and the absence of any apparent reason for changing the former statute, we are of opinion that the change of phraseology does not indicate an intention to change the law. This conclusion is fortified, by reference to other clauses of the statute, which seem to require, that the words " next of kin " should be construed as including the widow of the decedent. The notice of appraisement is to be served on the "legatees and next of kin." (2 R. S. 82, § 3.) The right to compel an accounting is confined to a "creditor, legatee or next of kin." (Id. 92, § 52.) The citation for a final accounting, is to be served on the same persons, and the decree is conclusive, to the extent specified in the statute, against all " creditors, legatees and next of kin, " upon whom the citation is served. (Id. 93, §§ 60, 66.) In none of the sections cited, is the widow named, and unless she is to be deemed included in the words " next of kin," she is not entitled to notice of appraisal, she cannot compel an accounting before the surrogate, and a final settlement may be had without notice to her; and it may very well happen, when she is neither executor, nor administrator, that notwithstanding she may have a very large interest, these important proceedings, may be had without her knowledge. The right of creditors also, requires the same enlarged construction of the words " next of kin." The statute gives an action to creditors who have neglected to present their claims, to recover the same, of the "next of kin and legatees" of the deceased, to whom any assets, shall have been paid or distributed. (2 R. S. 90, § 42.) Such an action, may be brought against such next of kin jointly, or one or more of them, for the amount received (2 R. S. 451, § 23), and the amount of the recovery, is to be apportioned among the defendants, in proportion to the value of the assets received by each (§ 24). The statute also provides for

contribution, in favor of any one of the next of kin, against whom a recovery may have been had, against the other relatives, to whom assets may have been paid (§ 25). Unless the words "next of kin," include the widow, the creditor could not under the statute, recover assets paid to her, and it is difficult to suppose that this construction was intended. (*Merchants' Ins. Co.* v. *Hinman,* 15 How. Pr. 182; *S. C.,* 34 Barb. 410.) We think the words "next of kin," used in the remedial provisions of the statute, were intended to include the widow of the testator, or intestate. This construction is necessary to protect her rights, and the rights of creditors, and is in harmony with the general statutory scheme for the settlement of the estates of decedents. We are therefore of opinion that the first ground upon which the motion for nonsuit is based was properly overruled.

The second ground on which a nonsuit was asked, viz., that there was no proof sufficient to submit to the jury, of a marriage between the plaintiff and Peter Betsinger, in May, 1863, cannot we think be sustained. There are doubtless grave reasons for hesitation, in reaching a conclusion that a marriage was consummated between the parties prior to January, 1864. The execution of the alleged ante-nuptial contract on the 19th of January of that year, and the formal ceremonial marriage between the parties, on the next day, seem at first blush, to be inconsistent with the fact of a prior marriage. But the case has been twice tried, once by the court, without a jury, and once before a jury, and on both trials, the question of the prior marriage was found for the plaintiff. There is no very satisfactory explanation of the ante-nuptial agreement (so called), or of the formal marriage in 1864, upon the theory of a prior marriage. The absence of evidence on the part of the plaintiff, of the circumstances, and inducements, under which she consented to sign the instrument of January 19, 1864, and to go through the ceremony of marriage on the next day, may have arisen from the fact, that she was herself an incompetent witness in the case, and from her inability to produce other witnesses who had any knowledge on the subject. The plaintiff in her verified reply to the answer of the administrators setting up the antenuptial agreement, and

the marriage on the 20th of January, 1864, in bar of the action, alleges, that she was induced to execute the agreement, and to consent to the subsequent marriage, by reason of fraudulent representations on the part of her husband. There is, however, no direct evidence to sustain the allegation of fraud. There is evidence that the intestate, on one occasion, in explaining the reason of the second marriage, stated that he "had to make a contract with his wife, and Peter had advised him to get married over again." The testator's son Peter, to whom he referred in this statement, was a lawyer's clerk, in the office of the attorney where the agreement of January 19, 1864, was drawn, and died before the trial of the action. The agreement itself, is subject to criticism, and furnishes some evidence on its face, that it was unfairly obtained. By the terms of the agreement the plaintiff agreed to accept $200, to be paid to her upon the decease of her proposed husband, in full of all claims against his estate, including dower, and her right to articles which might be set apart to her as widow, by the appraisers, under the statute. The intestate, when this agreement was made, possessed quite a large property, for a man in his position in life, and the consideration which the plaintiff was to receive, for relinquishing her marital rights therein, was grossly inadequate.

The evidence to prove a marriage in May, 1863, was circumstantial. There was no proof of the actual solemnization of a marriage at that time. The facts proved on the part of the plaintiff may be briefly stated. The intestate, in 1862, was introduced to the plaintiff through mutual friends. He was at that time a widower about fifty years of age, a farmer, and having children, some of whom lived with him. The plaintiff was thirty years of age, and "worked out" in the neighborhood. In April, 1863, the intestate induced a Mr. Miller (whose wife was Betsinger's niece), to employ the plaintiff, saying to him that he intended to make her his wife. He visited the plaintiff frequently while she was at Mr. Miller's. On Sunday, in the latter part of May, the intestate came to Mr. Miller's in a buggy, and took the plaintiff, and they started together toward Peterboro. They returned in the evening

after the family had retired and were heard in conversation outside of the house, in which conversation the fact that they were married was recognized. About a week after the intestate went to Mr. Miller's and took the plaintiff away. He introduced her at that time to persons in the house as his wife. In June, 1863, the parties went to the house of the plaintiff's brother, and she introduced the intestate to her father, brother and sister, as her husband, and Betsinger addressed the plaintiff's father as "father." In July, the intestate visited the plaintiff at a Mr. Fields', where she was working, and lodged with her, stating to Mr. Fields that she was his wife. In August, the plaintiff and Mr. Betsinger went to her mother's house and remained over night, occupying the same room, and were recognized and treated as man and wife. The intestate was introduced to Dr. Huntley at that time by the plaintiff's brother as his brother-in-law. In the summer of 1863 Betsinger introduced the plaintiff to Mrs. Crook (a niece), and to his nephew, Abram Betsinger, and to other persons as his wife. Dr. Jarvis was called in December, 1863, to see the plaintiff who was sick at the house of a Mr. Peckham, where it appears the intestate had engaged board for her. Dr. Jarvis called to see the plaintiff professionally several times at Mr. Peckham's. Early in January, 1864, and before the marriage in that month, Mr. Betsinger called on Dr. Jarvis and asked him for his bill for "doctoring his wife," and, on its being made out, paid it. He stated to Mrs. Crook that "they went off and were married" from Mr. Miller's, and he stated to Hathaway that he was married in the spring of 1863 at Peterboro. He stated to Mr. Miller in October, 1863, that "he was going to take her" (plaintiff) "home when his daughter went away." He said to Mrs. Tipple, in the summer of the same year, "I should have kept house with her" (plaintiff), "but my children made such a fuss that I could not." After the marriage in January, 1864, the parties lived together most of the time until the testator's death in 1876. Some doubt was raised by the cross-examination as to the accuracy of some of the plaintiff's witnesses, but we think the evidence authorized the submission to the jury of the question whether the parties were married in 1863.

The rule has been frequently recognized in this State that proof of matrimonial cohabitation, declarations of the parties, and reputation that they are man and wife, is sufficient upon which to found a presumption of marriage. (*Fenton* v. *Reed*, 4 Johns. 52; *Van Buskirk* v. *Claw*, 18 id. 345; *Clayton* v. *Wardell*, 4 N. Y. 230; *O'Gara* v. *Eisenlohr*, 38 id. 296.) The cohabitation proved in this case prior to 1864, was inconstant and occasional only, but there is no evidence that it was illicit in its origin. On the contrary, the evidence tends to show that it was matrimonial and not meretricious. The fact that the intestate did not take the plaintiff to his home until 1864, is accounted for, consistently with an actual marriage before that time. The cohabitation in connection with the concomitant facts of the declarations of the parties, their reception by their friends, and relatives, as man and wife, and the recognition of that relation by themselves, and the persons with whom they associated, tended to prove an actual marriage. The courts of this State, have gone very far in indulging a presumption of marriage from cohabitation and reputation. It has been held, that a subsequent marriage might be presumed from these facts, although the parties originally came together under a void contract. (*Fenton* v. *Reed*, supra; *Van Buskirk* v. *Claw*, supra; *Rose* v. *Clark*, 8 Paige, 574.) So also a prior marriage, has been presumed, where there was a subsequent actual marriage between the same parties. (*Starr* v. *Peck*, 1 Hill, 270.) If the evidence was sufficient to raise a presumption of marriage as to the husband, it must necessarily, as was said by the chancellor in *Rose* v. *Clark*, be sufficient to entitle the plaintiff to the widow's portion of the estate, under the statute of distributions. The evidence of Mrs. Remington was wholly worthless. It did not establish, or tend to establish any material fact in the case, and the exception to its reception, is not a ground for the reversal of the judgment.

The judgment should be affirmed.

All concur, except RAPALLO, J., absent.

Judgment affirmed.